UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>ZIGNAL LABS, INC., a Delaware Corporation<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT

1.    X Corp. (sometimes herein X) was forced to bring this lawsuit after a yearlong refusal by Zignal Labs, Inc. (sometimes herein Zignal) to honor its binding contractual commitment to pay invoices totaling $892,580.65, plus contractual interest, for enterprise access to X's Application Programming Interface (API) that Zignal enjoyed continuously from February 2025 to July 2025.

2.    After several months of unsuccessful attempts by X to recover Zignal's debt, including Zignal's bad faith assurances that payment was forthcoming, X was forced in June 2025 to terminate its services to Zignal and permanently disconnect Zignal's access to the X API.

3.    Even after X terminated its services, Zignal repeatedly flouted its contractual duty to expunge all X data pursuant to the Master License Agreement and to cease all access to that data. As just one example, Zignal has repeatedly attempted to circumvent X's enterprise API and access the very data from which it had been cut off, including as recently as March 2026.

4.    X brings this lawsuit to recover the funds which it is indisputably owed and to obtain judicial declarations and orders enforcing X's contractual rights, including for Zignal to

expunge all X data in its possession and to cease and desist its unlawful efforts to obtain X data without X's authorization.

## PARTIES

5.  Plaintiff X Corp is the successor in interest to Twitter, Inc. and is a corporation organized and existing under the laws of the State of Nevada.

6.  X's principal place of business and corporate headquarters are in Bastrop, Texas.

7.  Defendant Zignal Labs, Inc. is a corporation organized and existing under the laws of the State of Delaware.

8.  Zignal's principal place of business and corporate headquarters are in San Francisco, California.

## JURISDICTION AND VENUE

9.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between X and Zignal and the amount in controversy exceeds $75,000.

10.  Venue is proper under the forum-selection clause to which X and Zignal agreed.

## STATEMENT OF THE CLAIM

11.  Zignal is a San Francisco-based social media monitoring platform that brands itself a software "intelligence company delivering AI and agentic intelligence."

12.  Since at least 2015, and at all times relevant to this dispute—January 1, 2025 to August 28, 2025 (Relevant Period) —Zignal operated a product that ingested and analyzed millions of social media messages every day, including those obtained through X's API, to provide "AI and agentic intelligence that enables earlier warning and sustained decision advantage" to its clients.

PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 2

**Between December 2016 and August 2025,
the Parties Agree to Dozens of API Contracts**

13. On December 1, 2016, Zignal and X (Parties) entered into the first of dozens of data subscription contracts (individually, API Contract, and, collectively, API Contracts) under which X would provide Zignal enterprise-level access to large quantities of real-time data generated on the X platform, then-Twitter, through its API (X Data).

14. On March 31, 2021, the Parties agreed to extend the API Contract by twenty-four months.

15. Between May 30, 2023, and July 2025, the Parties operated pursuant to monthly auto-renewing API Contracts at a rate of $210,000 per month for access to X's "Enterprise API Large Package," which included, among other X Data, real-time data from up to 200 million tweets/posts and 200,000 "full archive" search requests.

**The Master License Agreement is Part
of the API Contracts**

16. The API Contracts expressly incorporated Twitter's, and later X's, Master License Agreement (MLA), at least 27 times.

17. Specifically, each of the API Contracts contained an express provision in the first sentence of each contract stating that the "Customer's access to and use of the Services and Licensed Materials are subject to the Twitter Master License Agreement located at https://legal.twitter.com/data-terms /us/mla.html."

18. Zignal thus agreed, at least 27 times, to abide by the MLA, the current version of which is available at https://legal.x.com/data-terms/us/mla.html.

19. The operative version of the MLA that governed the Parties' conduct during the Relevant Period was the version "last updated" on "April 16, 2025." (*See* April 16, 2025 MLA,

available at http://web.archive.org/web/20250623064253/https://legal.x.com/data-terms/us/mla.html.)

20. Among the binding provisions of the MLA to which Zignal agreed are Sections "7.2 Payment Terms" and "7.3 Late Payments," which at all times provided:

> i.    **"You will pay Fees within thirty (30) days after the invoice date**."
>
> ii.   **"If you fail to pay any past due invoice within ten (10) days after your receipt of a past due notice . . . X may charge interest on all past due invoices at a rate of 1.5% per month, or the highest rate allowed by applicable law, whichever is lower."**

(MLA §§ 7.2-7.3 (emphases added).)

21. Zignal also agreed that the services and data that would be provided under the relevant API Contracts would be delivered on an "as is" basis, and that X does not make any warranties about the quality of its service:

> "[T]he services and the licensed material are provided solely "as is," "as available" with all faults, and your use of the licensed material is at your own sole risk.  X does not make, and hereby disclaims, any and all other express and implied warranties, including all warranties of merchantability, quality, performance, fitness for a particular purpose, non-infringement, title, and any warranties arising from court of dealing, usage, or trade practice, in connection with this agreement."

(MLA § 11.4.)

22. Nevertheless, during the entire Relevant Period, Zignal received uninterrupted access to all services and X Data that it contracted for, including real-time access to 200 million X posts.

23. Under the MLA, the Parties further agreed that X may terminate services under the API Contracts for non-payment "within ten (10) business days after receipt of written notice from X" regarding such non-payment.  (MLA § 8.2.)

24. The Parties further agreed that, in the event of such termination by X for non-payment,

Zignal will (a) fully expunge all X Data with proof of deletion, and (b) "pay X all of the Fees owed for the remainder of each then-current Order Term." (MLA § 8.3.)

25.    Finally, the MLA provided that the "laws of the State of Texas, excluding its choice of law provisions, will govern this Agreement and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary." (MLA § 14.6.)

**Throughout the Relevant Period, Zignal Refuses
to Pay Nearly $900,000 in Invoices**

Zignal Fails to Pay its March 2025 Invoice for $210,000

26.    In March 2025, pursuant to the MLA and API Contract, X sent Zignal Invoice #18028910, dated March 1, 2025, for $210,000 (March 2025 Invoice), which was due to be paid in full on March 31, 2025.

27.    Despite receiving the benefits of the API Contract as reflected in the March 2025 Invoice, Zignal failed to pay at least $100,000 of the March 2025 Invoice by the March 31, 2025 due date.

28.    To date, despite a binding contractual commitment to pay X for access to X's API throughout the month of March, Zignal has failed to make the required payment of the remaining $100,000.

Zignal Fails to Pay its April 2025 Invoice for $210,000

29.    In April 2025, pursuant to the MLA and API Contract, X sent Zignal Invoice #18028995 for $210,000 (April 2025 Invoice), which was due to be paid in full on May 1, 2025.

30.    Despite receiving the benefits of the API Contract as reflected in the April 2025 Invoice, Zignal failed to pay the April 2025 Invoice by the May 1, 2025 due date.

31.    To date, despite a binding contractual commitment to pay X $210,000 for access to X's API throughout the month of April, Zignal has failed to make the required payment of

$210,000.

<u>Zignal Fails to Pay its May 2025 Invoice for $210,000</u>

32.    In May 2025, pursuant to the MLA and API Contract, X sent Zignal Invoice #18029085 for $210,000 (May 2025 Invoice), which was due to be paid in full on May 31, 2025.

33.    Despite receiving the benefits of the API Contract as reflected in the May 2025 Invoice, Zignal failed to pay the May 2025 Invoice by the May 31, 2025 due date.

34.    To date, despite a binding contractual commitment to pay X $210,000 for access to X's API throughout the month of May, Zignal has failed to make the required payment of $210,000.

<u>Zignal Fails to Pay its June 2025 Invoice for $210,000</u>

35.    In June 2025, pursuant to the MLA and API Contract, X sent Zignal Invoice #18029278 for $210,000 (June 2025 Invoice, which was due to be paid in full on July 1, 2025.

36.    Despite receiving the benefits of the API Contract as reflected in the June 2025 Invoice, Zignal failed to pay the June 2025 Invoice by the July 1, 2025 due date.

37.    To date, despite a binding contractual commitment to pay X $210,000 for access to X's API throughout the month of June, Zignal has failed to make the required payment of $210,000.

<u>Zignal Fails to Pay its July 2025 Invoice for $162,580.65</u>

38.    In August 2025, pursuant to the MLA and API Contract, X sent Zignal Invoice #1927149 for $162,580.65 (Prorated July 2025 Invoice), which was due to be paid in full on August 28, 2025.

39.    The Prorated July 2025 Invoice represented Zignal's continuous and uninterrupted access to the X API, and all X Data provided thereunder, from July 1, 2025 to July 25, 2025, the

date on which Zignal's access to the X API was disconnected due to its delinquent account status.

40.    Despite receiving the benefits of the API Contract as reflected in the Prorated July 2025 Invoice, Zignal failed to pay the Prorated July 2025 Invoice by the August 28, 2025 due date.

41.    To date, despite a binding contractual commitment to pay X $162,580.65 for access to X's API throughout the month of July, Zignal has failed to make the required payment of $162,580.65.

42.    By August 28, 2025, Zignal owed $892,580.65 in total unpaid invoices from the Relevant Period (Zignal Debt).

**Between March 2025 and June 2025, X Diligently Attempts to Collect the Zignal Debt, while Zignal Falsely Assures it Will Pay**

43.    Between March 28, 2025 and June 24, 2025, X made repeated good faith attempts to collect the Zignal Debt, including through multiple emails and phone calls to Zignal leadership.

44.    Despite several bad faith assurances that full payment was right around the corner, Zignal never came close to paying the Zignal Debt.

45.    For example, on at least March 31, 2025, June 11, 2025, and August 15, 2025, Zignal's Chief Financial Officer, Chris Krook, repeatedly assured X that full payment of the Zignal Debt was forthcoming:

> On Wed, Jun 11, 2025 at 4:57 PM Chris Krook <chris.krook@zignallabs.com> wrote:
> Leny-
>
> Apologies for this delay. Zignal is looking to close a new round of funding by early next week. That will allow a further payment on the outstanding invoices.
>
> Please give me until early next week and will have a payment  / update to you immediately at that time.
>
> Respectfully,
>
> Chris

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 7**

On Wed, Jun 18, 2025 at 3:05 PM Chris Krook <chris.krook@zignallabs.com> wrote:

Leny-

Sorry for the slow response and time to get Zignal's account caught up.

We will remit a payment this week (by Thursday) and we plan to have this caught up in early July.

This week, I will release a minimum of $50K and am trying to get that over $100K based on projected collections.

I will give you the exact amount on Thursday.

Many thanks,

Chris

On Fri, Aug 15, 2025 at 11:21 AM Chris Krook <chris.krook@zignallabs.com> wrote:

Leny-

Sorry for the delay in communicating to you the payment status.

Zignal has hada. small delay in critical customer receipts that has forced this small delay. We are fully expecting this to be corrected by next week and we will recommence the payments to your firm.

I will provide a more detailed plan to get this account fully paid early next week.

Many thanks and hope all is well with you.

46.     Despite these assurances, Zignal made only $110,000 in total payments during the Relevant Period, representing approximately 10% of the total debt it incurred.

**X is Forced to Terminate its Services to
Zignal Due to Non-Payment**

47.     Ultimately, after several months of bad faith assurances that payment was right around the corner, X was forced, on June 24, 2025, to send a formal Notice of Breach and Intent to Terminate services to Zignal due to non-payment pursuant to Section 8.2 of the MLA (Termination Letter).

48.     Section 8.2 of the MLA provides that:

> A party may terminate this Agreement or an Order if the other party breaches this Agreement and fails to cure such breach **within thirty (30) days** . . . except in the case of your failure to pay Fees, **which must be cured within ten (10) business days after receipt of written notice from X.**

(MLA § 8.2)

49. Under Section 8.2 of the MLA, Zignal was given "ten (10) business days after receipt of written notice from X" to cure its breach of the MLA based on non-payment of the Zignal Debt.

50. Despite receiving the Termination Letter, which both noticed the breach and provided an opportunity to cure that breach, Zignal failed to cure its breach by paying the Zignal Debt within ten days (by July 8, 2025) or within thirty days (by July 25, 2025).

51. Accordingly, as of July 8, 2025, X services to Zignal were terminated pursuant to Sections 8.2 and 8.3 of the MLA.

52. Under MLA Section 8.3, notwithstanding such termination, Zignal was required "pay X all of the Fees owed for the remainder of each then-current Order Term," which, as of July 8, 2025, extended through July 31, 2025.

53. However, because X disconnected Zignal's API access for non-payment on July 25, 2025, X did not invoice Zignal for API access after that date, and instead invoiced Zignal only for the Prorated July 2025 Invoice representing Zignal's access through July 25, 2025.

54. In the end, despite receiving all of the benefits of the API Contracts and MLA, including daily access to X's API from at least March 1, 2025 through at least August 28, 2025, Zignal has failed to pay the Zignal Debt.

55. As a direct result of Zignal's bad faith refusal to honor its binding contractual obligations to pay the Zignal Debt, X seeks no less than $1,019,522, as of March 25, 2026, representing the Zignal Debt, plus contractual interest accruing "at a rate of 1.5% per month, or the highest rate allowed by applicable law, whichever is lower." (MLA § 7.3.)

**Following Termination of API Services, Zignal Continues
Breaching the MLA by Refusing to Provide Proof of
Data Expungement, As Required by Section 8.3**

56. On August 18, 2025, following termination of API services, X contacted Zignal to remind Zignal of its continuing obligations under the MLA.

57. Specifically, X reminded Zignal that Zignal was required to "expunge all X data stored and cached in your systems" pursuant to Section 8.3 of the MLA, which provides:

> Immediately upon the effective date of termination of this Agreement . . . (b) **you will permanently delete all X Content and X Marks in all forms and types of media, and all copies thereof, in your possession**. . . (d) **within thirty (30) calendar days after such termination, each party will return or destroy all Confidential Information of the other party in its possession and will not make or retain any copies of such Confidential Information** . . . Upon the request of X for any reason, **you will promptly (and in any event within ten (10) business days of such request) provide evidence** (e.g., screenshots of deletion confirmation) of compliance with the provisions of the aforementioned subparts (b) and (d) of this Section 8.3.

(MLA § 8.3.)

58. Despite these contractual obligations, and X's August 18, 2025, written reminder of the same, Zignal never provided the required "evidence" "of compliance with the provisions" of Section 8.3 and, thus, remains in breach of the MLA.

**Also Following Termination of API Services, Zignal Repeatedly
Attempts to Circumvent the X API and Continues Accessing
X Data in Violation of the MLA and Developer Agreement**

59. Undeterred by its continued breach of the MLA, as well as having been terminated from accessing the X API, Zignal made multiple attempts to circumvent the X API and to continue accessing enterprise-level X Data to which it had been cut off as a result of its breach of contract.

60. On February 13, 2026, despite repeatedly agreeing that "**[y]ou may only use the X**

**Content as specifically detailed in a mutually executed Order**", "**[y]ou must submit to X for approval (a) each new Customer Application before launch**" (MLA § 5.1), Zignal attempted to circumvent these requirements by creating a new application using X Data and purchasing API credits through X's "self-serve" "pay-as-you-go" access tier, which is reserved for hobbyists and small developers, rather than enterprise customers like Zignal.

61. Likewise, as set forth in X's Developer Terms to which Zignal agreed as a subscriber to X's API (Developer Agreement), Zignal was required to "**subscribe to the tier that best fits [its] use case**." *See* X's Developer Agreement § III(J), available at https://docs.x.com/developer-terms/agreement.

62. As set forth in the terms of the 27 API Contracts to which Zignal agreed, the "tier that best fit [Zignal's] use case," at all relevant times, was the Enterprise tier—a tier for which Zignal had contracted to pay $210,000 per month.

63. Despite repeatedly agreeing that its subscription for X API and X Data had to be for Enterprise-level API access, Zignal knowingly subscribed to the "self-serve" "pay-as-you-go" access tier, which is reserved for hobbyists and small developers.

64. On February 17, 2026, X discovered Zignal's unauthorized and contractually prohibited attempt to gain access to the X API and again disconnected Zignal's access—this time through Zignal's second application.

65. A few short weeks later, Zignal *again* attempted to circumvent the above-referenced contractual requirements and its prior termination, by creating yet another application on March 5, 2026 and signing up through X's "self-serve" "pay-as-you-go" access tier, which is reserved for hobbyists and developers, rather than enterprise customers like Zignal.

66.    On March 9, 2026, X again discovered Zignal's latest attempt to circumvent the X API and again disconnected Zignal's access.

## FIRST CAUSE OF ACTION

### Breach Of Contract

**(MLA §§ 7.2-7.3)**
**(March 2025 API Contract);**
**(April 2025 API Contract);**
**(May 2025 API Contract);**
**(June 2025 API Contract);**
**(Prorated July 2025 API Contract)**

67.    X re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 66 above.

68.    Pursuant to MLA Section 7.2 and 7.3, as well as the March 2025 API Contract, April 2025 API Contract, May 2025 API Contract, June 2025 API Contract, and Prorated July 2025 API Contract, Zignal was required to make timely payment of $210,000 per month, in exchange for the provision by X of X Data during the Relevant Period.

69.    Each of these five API Contracts incorporated by reference the MLA, under which the Parties agreed that Zignal would "pay Fees within thirty (30) days after the invoice date." (MLA § 7.2.)

70.    Zignal further agreed that if it "fail[ed] to pay any past due invoice within ten (10) days after your receipt of a past due notice from X . . . X may charge interest on all past due invoices at a rate of 1.5% per month, or the highest rate allowed by applicable law, whichever is lower." (MLA § 7.3.)

71.    At all relevant times, X fully performed its obligations under the API Contracts and the MLA, including by providing Zignal timely access to the specific units of data it contracted for in the five API Contracts.

72.   By refusing to pay the Zignal Debt despite numerous written demands by X, Zignal has knowingly breached each of the five API Contracts, as well as Section 7 of the MLA.

73.   Such breach has caused monetary injury to X, totaling no less than $892,580.65, plus prejudgment contractual interest and any post judgment statutory interest.

**SECOND CAUSE OF ACTION**

**Breach Of Contract**

**(MLA § 8.3)**

74.   X re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 73 above.

75.   Pursuant to Section 8.3(b) of the MLA, Zignal was required, "immediately upon the effective date of termination" to "**permanently delete all X Content** and X Marks in all forms and types of media, and all copies thereof, in your possession." (MLA § 8.3(b).)

76.   Pursuant to Section 8.3(d) of the MLA, Zignal was required to "within thirty (30) calendar days after such termination" "**return or destroy all Confidential Information**," which is defined to include "proprietary information" or information that "by its nature or content would reasonably be considered confidential under the circumstances." (MLA § 9.1 (enumerating categories of Confidential Information "including without limitation, information (tangible or intangible) regarding a party's technology, designs, techniques, research, know-how, specifications, product plans, pricing, customer information, user data, current or future strategic information, current or future business plans, policies or practices, employee information, and other business and technical information.).)

77.   Finally, pursuant to Section 8.3 of the MLA, Zignal was required to "[u]pon the request of X for any reason, **you will promptly** . . . **provide evidence** (e.g., screenshots of deletion

confirmation) of compliance with the provisions of the aforementioned subparts (b) and (d) of this Section 8.3." (MLA § 8.3.)

78. Despite these contractual obligations, and X's August 18, 2025 written reminder of the same, Zignal never provided the required "evidence" "of compliance with the provisions" of Section 8.3(b) or 8.3(d).

79. Zignal's failure to comply with the requirements of Section 8.3 of the MLA constitutes breach of the same.

## THIRD CAUSE OF ACTION

### Breach Of Contract

### (Developer Agreement § III(J))

80. X re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 79 above.

81. Pursuant to the Developer Agreement, III(J), to which Zignal was at all relevant times bound, Zignal was required to "**subscribe to the tier that best fits [its] use case**." *See* X's Developer Agreement § III(J), available at https://docs.x.com/developer-terms/agreement.

82. As set forth in 27 API Contracts, the "tier that best fit [Zignal's] use case" was the Enterprise tier for which Zignal had contracted to pay $210,000 per month.

83. Between February 2026 and March 2026, in an attempt to circumvent this binding contractual requirement, Zignal subscribed to the "self-serve" "pay-as-you-go" access tier reserved for hobbyists and small developers, and created at least two new applications in service of that circumvention.

84. By repeatedly subscribing to an API access tier that it knew did not "best fit [its] use case," Zignal breached Section III(J) of the Developer Agreement.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment Action

### (28 U.S.C. § 2201)

85.    X re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 84 above.

86.    X brings this declaratory judgment action against Zignal under 28 U.S.C. § 2201.

87.    An actual controversy within this Court's jurisdiction exists between X and Zignal over the rights and other legal relations of the Parties, thus entitling X to declaratory relief, including the following declarations:

a.    Zignal breached its contractual obligations to X under the MLA, the API Contracts, and the Developer Agreement, as alleged above;

b.    X properly terminated services to Zignal under the MLA and API Contracts, effective as of July 8, 2025;

c.    Zignal failed to "expunge all X data stored and cached in [Zignal's] systems" pursuant to Section 8.3 of the MLA and API Contracts;

d.    Zignal failed to "permanently delete all X Content and X Marks in all forms and types of media, and all copies thereof, in [its] possession," as Zignal was required under Section 8.3 of the MLA and the API Contracts;

e.    Zignal failed to "return or destroy all Confidential Information of [X] in [Zignal's] possession" and has wrongfully made and/or retained copies of such Confidential Information, in violation of Section 8.3 of the MLA and the API Contracts;

f.    Zignal failed to provide the required "evidence" "of compliance with the provisions" of Section 8.3 and, thus, remains in breach of the MLA and the API Contracts.

g. Following termination of the MLA and API Contracts, Zignal has repeatedly attempted to circumvent its contractually-agreed and limited access to the X API and X Data in violation of the MLA and Developer Agreement, including by creating new applications using X Data and falsely identifying itself as a "self-serve" "pay-as-you-go" access tier developer, which is reserved for hobbyists and small developers, rather than purchasing access as what Zignal contractually agreed it was—an Enterprise tier developer that would be required to have a subscription and to pay $210,000 per month to access the X API and X Data Zignal has repeatedly sought to access since breaching its subscription agreement and having its access terminated;

h. Zignal must immediately:

    i. "expunge all X data stored and cached in [Zignal's] systems;"

    ii. "permanently delete all X Content and X Marks in all forms and types of media, and all copies thereof, in [its] possession;"

    iii. "return or destroy all Confidential Information of [X] in [Zignal's] possession," including all such information that it has made and/or retained copies of; and

i. Within seven (7) days thereafter, Zignal must provide the required "evidence" "of compliance with the provisions" of Section 8.3 of the MLA and this Court's order; and

j. Zignal shall immediately cease and desist all efforts to access and/or obtain the X API and X Data.

## ATTORNEYS FEES

88. Pursuant to Section 38.001(b)(8), Texas Civil Practice & Remedies Code, X is entitled to and hereby seeks recovery of its attorneys' fees and costs incurred in this action.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff prays for judgment granting and/or awarding the relief

requested as follows:

1.  the judicial declarations set forth above;

2.  damages in an amount of no less than $892,580.65;

3.  pre-judgment and post-judgment interest;

4.  reasonable attorney's fees pursuant to Texas Civil Practice & Remedies Code § 38.001(b)(8);

5.  all costs of court; and

6.  any and all other relief the Court deems just and proper.

DATED: April 6, 2026

Respectfully submitted,


*/s/ Charles W. Fillmore*
Charles W. Fillmore
State Bar No. 00785861
cfillmore@brownpruitt.com
**BROWN PRUITT WAMBSGANSS**
**DEAN FORMAN & MOORE, P.C.**
201 Main Street, Suite 700
Fort Worth, Texas 76102
Telephone: (817) 338-4888
Fax: (817) 338-0700
Attorneys for Plaintiff